UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CALLIE GINNISE JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:15-CV-1457 JAR |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Callie Ginnise Johnson's ("Johnson") applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.

**I.  Background**

On May 15, 2012, Johnson filed applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr. 215), and for SSI benefits under Title XVI of the Act, 42 U.S.C. §§1381, et seq. (Tr. 207-219). In both applications, Johnson alleged disability beginning March 1, 2012 (Tr. 207, 213). The Social Security Administration ("SSA") denied Johnson's claims on July 2, 2012 (Tr. 109). Johnson filed a timely request for a hearing before an administrative law judge ("ALJ") on September 7, 2012 (Tr. 115). After a hearing held on February 11, 2014 (Tr. 54-88) and continued to June 10, 2014 (Tr. 29-53), the ALJ issued a written decision on June 19, 2014, upholding the denial of benefits (Tr. 7-23). Johnson requested review of the ALJ's decision by the Appeals Council (Tr. 24-28). On August 13, 2015, the

Appeals Council denied her request for review (Tr. 1). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Johnson filed this appeal on September 23, 2015 (Doc. 1). The Commissioner filed an Answer (Doc. 10). Johnson filed a Brief in Support of her Complaint (Doc. 14), and the Commissioner filed a Brief in Support of the Answer (Doc. 20). Johnson did not file a Reply Brief.

## II.     Decision of the ALJ

The ALJ determined that Johnson meets the insured status requirements of the Social Security Act through June 30, 2014, and had not engaged in substantial gainful employment since March 1, 2012, the alleged onset date of disability (Tr. 12). The ALJ found that Johnson had the severe impairments of degenerative disc disease, obesity, bipolar disorder, personality disorder, and substance dependence, but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 12-13).

After considering the entire record, the ALJ determined Johnson had the residual functional capacity ("RFC") to perform light work, except for the following nonexertional limitations:  can sit for six of eight hours per day; can stand and walk for six of eight hours per day; can lift 20 pounds occasionally and ten pounds frequently; can occasionally climb ladders, ropes or scaffolds; and is limited to simple, repetitive tasks with one-to-two step instructions and occasional interaction with supervisors, co-workers, and the public (Tr. 12-14). The ALJ found Johnson unable to perform any past relevant work; however, based on her age, education, work experience, and residual function capacity ("RFC"), the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Johnson can perform, including bench

assembler and nut and bolt assembler (Tr. 18-19). Thus, the ALJ concluded that Johnson had not been under a disability from the alleged onset date of March 1, 2012 through the date of his decision, June 19, 2014 (Tr. 19).

### III. Administrative Record

The following is a summary of the relevant evidence before the ALJ.

#### A. Hearing Testimony

The ALJ held a hearing in this matter on February 11, 2014, which was continued to June 10, 2014. The ALJ heard testimony from Johnson; Matt Lamply, a vocational expert[1]; and Charles Auvenshine, Ph.D., a psychological expert.

#### 1. Johnson's testimony

Johnson was 31 years old at the time of the hearing and living with her 10-year-old daughter and 5-year-old son (Tr. 60-61). She completed the tenth grade and has no further training or education (Tr. 63-64). Johnson enrolled in GED preparation classes in January 2014, and was attending those classes three times per week (Tr. 35, 64, 71, 75). Johnson does not have a driver's license (Tr. 62). She testified that she has not worked since 2011 (Tr. 64).

It was Johnson's testimony that her ability to work was affected after she was diagnosed with psychiatric disorders in March 2012 (Tr. 67-68). On a typical day, Johnson gets up at 7:00 in the morning. She usually takes her son to school, returns home, and frequently goes back to sleep until it is time to pick up her son at 3:00 in the afternoon (Tr. 68, 70). She does housework, including cooking, laundry, washing dishes, and cleaning. She goes grocery shopping once per month (Tr. 69). Johnson has friends, but stays home "90 percent of the time" (Tr. 68). She is not active in any clubs or organizations, and she does not attend church (Tr. 70).

---

[1] The ALJ also heard testimony from Khalid Moussa, a medical expert, regarding Johnson's physical conditions. Because Johnson does not dispute the ALJ's findings as to her alleged physical disabilities in this appeal, the Court will not summarize Dr. Moussa's testimony.

Johnson had a drinking problem for several years; she had abstained from alcohol for the eight months preceding the February 2014 hearing and had not consumed alcohol between the February and June 2014 hearings (Tr. 36, 73, 81). She stopped drinking because she "had an episode where [she] had been drinking, and [her] children looked like demons to [her]," and she was "afraid [she] might hurt them" (Tr. 73). She attends weekly Alcoholics Anonymous meetings (Tr. 71, 86).

Johnson has twice been hospitalized for treatment of her psychiatric conditions: she was first hospitalized after she attempted suicide at age fourteen, and she was later hospitalized when she experienced psychotic tendencies while detoxifying from alcohol (Tr. 76-77). Johnson also has depression and anxiety, and she has experienced panic attacks in the past (Id.). She testified that she had been diagnosed with multiple personality disorder and posttraumatic stress disorder ("PTSD"), and that she suffers from depression, anxiety, and recurring nightmares (Tr. 35-36, 68, 76-79, 82). Johnson takes Seroquel, an antipsychotic and antidepressant, which makes her groggy and tired, and limits her ability to focus (Tr. 74, 86-87). She testified that she has flashbacks related to her PTSD, that she does not retain information as well as she did when she was younger, that she does not handle stressful situations very well, and that she has difficulty completing big tasks (Tr. 34, 84-85).

At the time of the February 2014 hearing, Johnson was undergoing chiropractic treatment for chronic back pain caused by previous car accidents, and she completed those treatments in May 2014 (Tr. 32, 79). She testified that she can stand or walk for ten minutes at a time before she needs to sit down; that she can only do housework in ten-minute increments; that she suffers unbearable pain with bending and standing; and that she could lift and carry at most fifteen

pounds (Tr. 33, 80). She also experiences pain with stooping, crouching, kneeling, and crawling (Id.).

**2. Testimony of Psychological Expert**

Charles Auvenshine, Ph.D., a psychologist, was appointed by the ALJ as an independent psychological expert. Dr. Auvenshine reviewed Johnson's medical records and testified at the hearing (Tr. 42, 194). His testimony will be discussed as part of the analysis.

**3. Testimony of Vocational Expert**

The ALJ asked vocational expert, Matt Lamply, to assume an individual of the claimant's age, education, and work history with the ability to perform a full range of work at the light exertional level with the following limitations: can carry, push, pull 20 pounds occasionally, and 10 pounds frequently; can stand or walk six out of eight hours; limited to occasional exposure to ladders, ropes or scaffolding; limited to simple, repetitive tasks and instructions, meaning one- or two-step tasks; and only occasional interaction with supervisors, co-workers, and the public (Tr. 49-50). Lamply opined that such an individual would be able to work as a bench assembler, Dictionary of Occupational Titles (DOT) number 706.687-022 with 1,800 such jobs available locally and 122,000 nationally (Tr. 50). Lamply further opined that such an individual would be able to work as a nut and bolt assembler, DOT number 929.587-010, with 1,500 jobs regionally, and 108,000 nationally (Id.).

Johnson's counsel then posed a second hypothetical, asking Lamply to assume the individual instead had moderate restrictions in her ability to maintain a work schedule and be consistently punctual; to maintain adequate attention, concentration, and focus on work duties throughout a normal workday; to complete a normal workweek without interruption from psychological symptoms; to work in coordination with or in close proximity to others or to

respond appropriately to criticism from supervisors or co-workers or accept instructions; and to respond appropriately to routine work-related stressors. For purposes of the hypothetical, counsel asked Lamply to assume that "moderate" indicates that the particular activity could be performed occasionally but not continually in a normal work setting. Lamply concluded that these additional limitations would allow Johnson to work less than one-third of a normal workday, and would thus preclude employment (Tr. 51-52).

### B. Medical Records

The ALJ summarized Johnsons' medical records at Tr. 15-17. Relevant medical records are discussed as part of the analysis.

### IV. Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the

claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then she will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that she is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F.Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir.2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;
(2) The education, background, work history, and age of the claimant;
(3) The medical evidence given by the claimant's treating physicians;
(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
(5) The corroboration by third parties of the claimant's physical impairment;

8

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

## V.  Discussion

In her appeal of the Commissioner's decision, Johnson argues that the ALJ failed to properly evaluate the medical opinion evidence (Doc. 14). More specifically, she contends that the ALJ erred by not giving significant or controlling weight to Dr. Gangure, her treating psychologist; by failing to explain the weight given to Dr. Auvenshire, a psychological expert who prepared a consultative report; and by basing Johnson's RFC on the improper evaluation of the medical opinion evidence (Id.). In response, the Commissioner urges affirmance of the ALJ's denial of benefits, asserting that the ALJ properly assessed Johnson's credibility and weighed the medical evidence, and that substantial evidence supports the ALJ's decision (Doc. 20).

**Medical opinion evidence**

Dr. Gangure started treating Johnson in December 2011 (Tr. 314). At that time, he diagnosed her with bipolar disorder, substance abuse, and borderline personality disorder; noted that she suffered from "severe" occupational, economic, and housing problems; and assigned her a Global Assessment of Functioning ("GAF")[2] score of 50 (Tr. 315-18). During a January 2012

---

[2] A GAF score is a determination based on a scale of 1 to 100 of a "clinician's judgment of the individual's overall level of functioning." Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000)). The Eighth Circuit Court of Appeals has noted that a GAF score between 41 and 50 "reflects *serious limitations* in the patient's general ability to perform basic tasks of daily life." Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (emphasis added). A GAF score of 51 to 60 is "indicative of 'moderate symptoms' or 'moderate difficulty in social, occupational, or school functioning.'" Lacroix v. Barnhart, 465 F.3d 881, 883 (8th Cir. 2006) (quotation omitted). A GAF score in the 51 to 60 range is not necessarily "inconsistent with [an] opinion that [the claimant] was permanently disabled for any type of employment, nor does it

evaluation, Johnson informed an intake nurse at Dr. Gangure's office that she had intermittent thoughts of suicide without intent, but that she had no desire to die. She also indicated that she was feeling extreme sadness and worthlessness, inability to concentrate, and frequent flashbacks (Tr. 331-35). Also in January 2012, Dr. Gangure performed a psychiatric evaluation, during which Johnson reported experiencing derogatory auditory hallucinations once or twice weekly; limited sleep; low self-esteem; and depressed mood (Tr. 320). She also reported anxiety, hypervigilance, avoidance, flashbacks, and nightmares, all of which interfered with her functioning. Johnson had been abused in the past, and had a history of substance abuse and paranoid thinking. Dr. Gangure noted that Johnson was alert, oriented, cooperative, and calm. She had depressed mood and affect. She was not overtly paranoid delusional, but experienced auditory hallucinations "at times" (Id.). Her insight was fair, her judgment was adequate, her impulse control was good, and her thought processes were within normal limits (Tr. 320-21). Dr. Gangure then diagnosed Johnson with, inter alia, major depressive disorder recurrent with psychotic features, PTSD, polysubstance abuse, borderline personality disorder; assigned her a GAF of 43; and prescribed her Seroquel and Zoloft (Tr. 321).

During a March 1, 2012 appointment with Dr. Gangure, Johnson reported that she was feeling better on the medications. Dr. Gangure noted that she "appeared clinically improved." Johnson was alert, oriented, cooperative, calm, and not overtly paranoid delusional. Her affect was full, her insight was fair, her judgment was adequate, and her thought process was within normal limits. She denied any hallucinations, suicidal ideation, or homicidal ideation (Tr. 321-22).

---

constitute substantial evidence supporting the ALJ's conclusion she is not disabled." Pate–Fires v. Astrue, 564 F.3d 935, 944 (8th Cir. 2009).

On March 6, 2012, Johnson was admitted into CenterPointe Hospital for treatment of "psychosis NOS" (Tr. 346-47). She reported visual hallucinations of choking people, was withdrawing from alcohol, and had heard voices as recently as a week earlier. She denied suicidal ideation. Johnson was placed in a secured behavioral unit where she was closely monitored; she underwent individual and group therapy, and was prescribed medications (Tr. 346). During her hospitalization, she reported tactile hallucinations after waking up from nightmares (Tr. 354). At her March 15, 2012 discharge, Johnson reported an improvement in her symptoms; was eating and sleeping well; was tolerating her medications without significant side effects; was oriented to time, place, person, and situation; had an appropriate affect; exhibited appropriate behavior; and did not manifest any symptoms of psychosis. As relevant, she was diagnosed with bipolar disorder, polysubstance dependence, and PTSD (Tr. 346-47).

On March 28, 2012, Johnson was admitted to a residential substance abuse treatment program. In a Medical Evaluation completed that same day, a nurse rated Johnson's GAF at 35, noting that Johnson suffered from several "severe" psychosocial and environmental problems, as well as hallucinations, delusions, and memory problems (Tr. 361-63). Johnson was discharged from the program on May 15, 2012, after she did not respond to treatment (Tr. 359).

From April 19, 2012 to April 10, 2014, Johnson had thirteen appointments with Dr. Gangure, primarily for medication management and psychotherapy. During this period, Johnson consistently was alert, oriented, and cooperative; presented with full affect; was not overtly paranoid delusional; and denied hallucinations, suicidal ideation, or homicidal ideation (Tr. 324-28, 455-74, 540-42). In April 2012, Dr. Gangure noted that Johnson appeared "clinically improved" (Tr. 324). During a January 2013 appointment, Johnson reported a relapse with alcohol, and Dr. Gangure noted that she had not been compliant with her medications or keeping

her appointments (Tr. 461-62). In March 2013, Johnson informed Dr. Gangure that she was experiencing auditory hallucinations; Dr. Gangure adjusted her medications (Tr. 463). In April 2013, Johnson presented with "thinking distortions" (Tr. 465). In July 2013, Johnson was seen by a different doctor because she had run out of her medications after missing her appointments with Dr. Gangure (Tr. 468-69). During an October 2013 appointment, Dr. Gangure advised Johnson to stop increasing the doses of her medications without first consulting with him; and revised Johnson's diagnosis to reflect that her history of psychosis was substance-induced (Tr. 470). In December 2013 and February 2014, Dr. Gangure again noted that Johnson was psychiatrically stable (Tr. 474, 540),

On February 6, 2014, Dr. Gangure completed a Physician's Assessment for Social Security Disability Claim (Tr. 532). He stated that Johnson's psychiatric condition "could significantly impact [her] ability to engage in any kind of sustained full-time competitive employment," and that she had "experienced significant functional limitations in more than one area (e.g. work, relations with others) in the context of serious and persistent mental illness" (Tr. 532). He also completed a Mental RFC Assessment (Tr. 533). Through a series of checked boxes he indicated that Johnsons had "moderate" limitations in the following areas: ability to maintain a work schedule and be consistently punctual; ability to maintain adequate attention, concentration and focus on work duties through a complete work day; ability to complete a normal work week without interruptions from psychologically based symptoms; ability to work in coordination with, or in close proximity to others; ability to accept instructions and respond appropriately to criticism from supervisors or co-workers; and ability to respond appropriately to routine work related stressors (Tr. 533). The Mental RFC form defined "moderate" as "indicat[ing] that the activity is not totally precluded but is significantly impaired in terms of

proficiency and/or the ability to sustain the particular activity over the course of a work day/week" and "[i]ndicat[ing] the activity can be performed occasionally but not continually, in a normal work setting" (Id.). Dr. Gangure indicated that Johnson had "mild" impairments in her ability to understand, remember, and carry out detailed instructions and procedures; ability to interact appropriately with the general public or customers; and ability to respond appropriately to routine changes in the work setting. The Mental RFC form defined "mild" as indicating "the ability to perform the particular activity is slightly impaired" and "the activity can be performed within acceptable tolerances on a sustained basis over the course of a normal work schedule" (Id.). Dr. Gangure further opined that Johnson had a "mild to moderate impairment" in her ability to maintain an acceptable personal appearance and hygiene; and that her ability to sustain extended periods of employment (greater than 6 months) without decompensation from periodic exacerbation of psychiatric symptoms was "variable; limited" (Id.).

The ALJ gave Dr. Gangure's opinion little weight. First, the ALJ concluded that Dr. Gangure's assignment of a GAF of 43 was largely unsupported by Johnson's records (Tr. 16). Specifically, the ALJ discounted Dr. Gangure's opinion as follows:

> From March 1, 2012 to April 10, 2014, [Johnson] was seen on multiple occasions by [Dr. Gangure] for major depression, recurrent with psychotic features, non-specific substance abuse and PTSD, as well as borderline personality disorder. Dr. Gangure estimated [Johnson's] GAF at 43, in the severe range, but the actual records do not reflect such severe symptoms. [GAFs] during the period have ranged from 43 to 50, and those numbers are largely unsupported. [Johnson] told Dr. Gangure that [s]he was adjusting well to [her] medications, was still "unsure of myself" and consistently reiterated [her] desire to get [her] GED as early as December 2011. From late 2011 to April 2012, [Johnson] tried to get along without medications, but it did not work well for [her], so [s]he resumed them. As of February 2014, [s]he was completing [her] GED classes, was alert and oriented to all spheres, had normal thought content and [her] mood was good. [She] denied hallucinations, suicidal and homicidal ideation and reported no paranoid feelings. [She] endorsed occasional feelings of irritability and anger as of April 2012, along with some brief "voices[,"] reduced sleep and lowered self-esteem. These symptoms were not consistently reported again thereafter, and [Johnson's] overall

13

condition was stable during this time. [Johnson] self-reported substance abuse, with a relapse in January 2013, but no further incidents were reported after that time. GAF scores in the range of 41 to 50 mean "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or an serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)[."]

(Tr. 16). The ALJ further discredited Dr. Gangure's assessment of the severity of Johnson's psychiatric impairments in the Physician's Assessment for Social Security Disability Claim and Mental RFC form, as follows:

> On February 6, 2014, [Johnson] was evaluated for psychological functioning in a medical source statement (MSS) by Dr. Gangure, who described [her] as having "serious, persistent mental illness[,"] and unable to work full-time, but who found no "marked" or "extreme"[3] limitations in function in any of the mental health work function criteria. Dr. Gangure noted "moderate" limitations in the ability to attend and concentrate on tasks; to maintain a schedule and maintain attendance and punctuality; complete an ordinary workday or work week without interruption from psychological symptoms; work in coordination of proximity to others without distracting them or being distracted by them; interact appropriately with supervisors and to withstand work stressors. All other workplace functional limitations were mild or less. Dr. Gangure's conclusions that [Johnson] cannot work at a full-time job are inconsistent with the limitations he noted under Part A and Part B.

(Tr. 17).

In contrast, the ALJ gave significant weight to the opinion of Dr. DeVore, a psychological expert who had evaluated Johnson in June 2012, at the behest of the state agency (Id.). Dr. DeVore's report included a Disability Determination Explanation, in which he found that Johnson had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (Tr. 92). He noted that Johnson had experienced one or two episodes of decompensation (Id.). Dr. DeVore's report also included a mental RFC assessment, in which he concluded that Johnson had moderate limitations in her ability to understand and remember detailed instructions, her

---

[3] Notably, the Mental RFC form did not include a check box for "extreme" (Tr. 533).

ability to carry out detailed instructions, and her ability to maintain attention and concentration for extended periods (Tr. 94). The ALJ gave Dr. DeVore's opinion significant weight, finding it generally consistent with the medical evidence of record (Tr. 17).

The ALJ also gave significant weight to the opinion of Dr. Auvenshine, a non-examining, independent psychological expert who based his opinion on a review of Johnson's psychiatric records. Dr. Auvenshine identified four categories of impairments from which he believed Johnson is suffering: affective disorders, anxiety disorders, personality disorders, and substance addiction disorders (Tr. 43). He opined that none of the four impairments, taken individually, rose to the level of meeting or equaling any of the impairments listed in the regulations (Tr. 44). As to the "B criteria," Dr. Auvenshine rated Johnson as having mild restrictions in activities of daily living; social functioning; and concentration, persistence and pace. He did not believe she met any of the "C criteria," and he did not identify any decompensation episodes. (Id.). When asked whether he agreed with Dr. Gangure's opinion that Johnson could perform certain work-related activities only occasionally and not continually in a normal work setting, Dr. Auvenshine responded that he did not. He instead believed that, as of the June 2014 hearing, Johnson was not "functioning at that level of severity" and was "doing very well" (Tr. 45). Dr. Auvenshine agreed that Dr. Gangure would have a unique perspective and a better understanding of Johnson's level of functioning than that which was reflected in the treatment records alone, given that he had treated her for two years (Tr. 46).[4] When asked whether it was unreasonable for Dr. Gangure to rate Johnson's impairments as severely he had, in light of his observations of her over the course of two years, Dr. Auvenshine responded that he could understand why Dr. Gangure would rate

---

[4] This is consistent with Eighth Circuit case law. See Shotos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) ("The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole.")

Johnson's impairments at the level he did (Id.). The ALJ concluded that Dr. Auvenshire agreed with the moderate limitations imposed by Dr. Gangure, and gave his opinion significant weight, finding that it was consistent with the medical evidence (Tr. 17).[5]

A treating physician's opinion is generally entitled to substantial weight but does not automatically control. Brown v. Astrue, 611 F.3d 941, 951-52 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 880 (8th Cir.2009) (internal quotations and citation omitted). "An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Id. "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." Andrews v. Colvin, 2014 WL 2968815, at *2 (E.D. Mo. July 1, 2014) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir.2000)).

Upon review of the record, the Court concludes that the ALJ did not give adequate consideration to Dr. Gangure's opinion. Initially, the Court disagrees with the ALJ's finding that Dr. Gangure's assignment of a GAF of 43 was not supported by the medical evidence. More specifically, the Court notes that a GAF of 43 was compatible with the standard for GAF scores in the 41 to 50 range to which the ALJ cited,[6] which deems a GAF between 41 and 50 appropriate where, inter alia, a patient has "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." Notably, during Johnson's January 2012 intake evaluation, a nurse noted that Johnson had "severe" occupational, economic, and housing problems; and in March 2012, when Johnson was admitted

---

[5] The Court further notes that Dr. Auvenshire's conclusion that Johnson had no decompensation episodes (Tr. 44) was inconsistent with the ALJ's finding that she had one or two such episodes (Tr. 13), which was supported by Dr. DeVore's opinion (Tr. 92).

[6] AM. PSYCHIATRIC ASS'N., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 2000).

for residential treatment, a nurse again noted that Johnson was facing "severe" psychosocial and environmental problems. In addition, Johnson was admitted for inpatient psychiatric treatment less than two months after Dr. Gangure assigned her a GAF of 43; and that Johnson was also assigned a GAF of 35 shortly thereafter, at her March 2012 admission for residential treatment. Cf. Juszczyk v. Astrue, 542 F.3d 626, 632-33 (8th Cir. 2008) (ALJ's decision not to rely on treating physician's GAF was supported by substantial evidence where assessment was extreme in light of contradictory medical evidence). It also appears that the ALJ discredited the accuracy of the GAF of 43, which was assigned in January 2012, based on Johnson's psychiatric condition in February 2014, or two years later. An ALJ may afford lesser weight to GAF ratings that appear to no longer reflect a claimant's current abilities in light of newer evidence of the claimant's current abilities. Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010); Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 666 (8th Cir. 2003). However, the Court questions the propriety of discrediting a significantly older GAF based on a treatment provider's subsequent medical observations, especially where, as here, it appears the claimant's condition may fluctuate over time. See id. (ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it). The Court thus concludes that the ALJ erred by discounting Dr. Gangure's opinion based on his GAF score assignment. Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013) (courts may consider GAF scores in reviewing ALJ's determination that treating source's opinion was inconsistent with treatment record).

The Court further concludes that the ALJ did not adequately explain his decision to discredit Dr. Gangure's opinion that Johnson was unable to maintain full-time employment based on apparent inconsistencies with the limitations Dr. Gangure had assigned her. The Mental RFC form defined "moderate" as "indicat[ing] that the activity is not totally precluded but is

17

significantly impaired in terms of proficiency and/or the ability to sustain the particular activity over the course of a work day/week" and "[i]ndicat[ing] the activity can be performed occasionally but not continually, in a normal work setting." Applying that definition of "moderate," Dr. Gangure appears to have been of the opinion that Johnson could not perform certain work-related activities because she was "significantly impaired in terms of proficiency and/or the ability to sustain the particular activity over the course of a work day/week," and that she was able to perform those activities "occasionally but not continually, in a normal work setting." Dr. Gangure's opinion that Johnson would not be able to maintain full-time employment does not appear to be inconsistent with those limitations.

In addition, the ALJ did not independently assess Dr. Gangure's opinion regarding the extent to which Johnson's psychiatric conditions impaired her ability to work full-time, applying the definition of "moderate" that Dr. Gangure himself applied. See Shew v. Colvin, 245 F.3d 700, 703-04 (8th Cir. 2001) (claimant's RFC is a medical question, but ALJ bears primary responsibility for assessing claimant's RFC based on all relevant evidence). Medical experts are not required to utilize the scale set forth in the regulations for rating the severity of a claimant's psychiatric impairments in their opinions as to a claimant's RFC. See Shontos v. Barnhart, 328 F.3d 418, 421-27 & n. 4-5 (8th Cir. 2003) (claimant's treatment providers' opinions provided substantial evidence to support finding of disability where they opined that claimant suffered from "marked" psychiatric disabilities that would interfere with her ability to work, notwithstanding providers' use of forms and questionnaires that independently defined "marked" and "fair"). The Court further notes that Dr. Gangure's opinion is supported by the vocational expert, who agreed that, given the Mental RFC's definition of "moderate," Johnson would be unable to maintain full-time employment with the limitations Dr. Gangure identified, as those

18

limitations would allow her to work less than one-third of a normal workday. For these reasons, the Court finds that, given the definition of "moderate" provided in the Mental RFC form, the ALJ did not give adequate consideration to Dr. Gangure's opinion. Therefore, the Court concludes that the ALJ failed to give "good reasons" for giving Dr. Gangure's opinion little weight, Prosch, 201 F.3d at 1013; and that the ALJ's decision to discount Dr. Gangure's opinion is not supported by substantial evidence on the record as a whole.

### VI. Conclusion

For the foregoing reasons, the Court finds there is not substantial evidence in the record to support the ALJ's discounting of Dr. Gangure's opinion. The ALJ has the duty to fully develop the record on issues such as this. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). This case must, therefore, be remanded. On remand, the ALJ is directed to further develop the record to include additional consideration and evaluation of Dr. Gangure's opinion.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **REVERSED AND REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration in accordance with this Memorandum and Order.

Dated this 30th day of September, 2016.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**